**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division**

| | | |
|---|---|---|
| **VIRGINIA STOUT,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Civil No. TMD 14-2596** |
| **v.** | * | |
| | * | |
| | * | |
| **CAROLYN W. COLVIN,** | * | |
| **Acting Commissioner of Social Security,** | * | |
| | * | |
| **Defendant.** | * | |

************

**MEMORANDUM OPINION GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Virginia Stout ("Plaintiff") seeks judicial review under 42 U.S.C. §§ 405(g) and 1383(c)(3) of a final decision of the Commissioner of Social Security ("Defendant" or the "Commissioner") denying her applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. Before the Court are Plaintiff's Motion for Summary Judgment (ECF No. 11) and Defendant's Motion for Summary Judgment (ECF No. 13).[1] Plaintiff contends that the administrative record does not contain substantial evidence to support the Commissioner's decision that she is not disabled. No hearing is necessary. L.R. 105.6. For the reasons that follow, Defendant's Motion for Summary Judgment (ECF No. 13) is **GRANTED**, Plaintiff's Motion for Summary Judgment (ECF No. 11) is **DENIED**, and the Commissioner's final decision is **AFFIRMED**.

---

[1] The Fourth Circuit has noted that, "in social security cases, we often use summary judgment as a procedural means to place the district court in position to fulfill its appellate function, not as a device to avoid nontriable issues under usual Federal Rule of Civil Procedure 56 standards." *Walls v. Barnhart*, 296 F.3d 287, 289 n.2 (4th Cir. 2002). For example, "the denial of summary judgment accompanied by a remand to the Commissioner results in a judgment under sentence four of 42 U.S.C. § 405(g), which is immediately appealable." *Id.*

# I

## Background

Plaintiff was born in 1966, has a high-school education, and previously worked as a bank teller and billing collection representative. R. at 20, 208. Plaintiff applied for DIB and SSI on January 12, 2012 (with a protective filing date of January 5, 2012), alleging disability beginning on August 7, 2011, due to visual impairments resulting from stroke, depression, seizures, anxiety attacks, hypertension, and hypercholesterolemia. R. at 10, 165-78, 192. The Commissioner denied Plaintiff's applications initially and again on reconsideration, so Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. at 50-108, 111-17. On May 17, 2013, ALJ F.H. Ayer held a hearing in Washington, D.C., at which Plaintiff and a vocational expert ("VE") testified. R. at 23-49. On May 31, 2013, the ALJ issued a decision finding Plaintiff not disabled from the alleged onset date of disability of August 7, 2011, through the date of the decision. R. at 7-22. Plaintiff sought review of this decision by the Appeals Council, which denied Plaintiff's request for review on July 1, 2014. R. at 1-6. The ALJ's decision thus became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481; *see also Sims v. Apfel*, 530 U.S. 103, 106-07, 120 S. Ct. 2080, 2083 (2000).

On August 15, 2014, Plaintiff filed a complaint in this Court seeking review of the Commissioner's decision. Upon the parties' consent, this case was transferred to a United States Magistrate Judge for final disposition and entry of judgment. The case subsequently was reassigned to the undersigned. The parties have briefed the issues, and the matter is now fully submitted.

**II**

**Summary of Evidence**

The Court reviews here and in Part VI below Plaintiff's relevant medical evidence from the alleged onset date of disability of August 7, 2011, to May 31, 2013, the date of the ALJ's decision.

**A.     Medical Evidence**

On August 7, 2011, Plaintiff was admitted to a hospital after overdosing on belladonna she had taken to help her sleep while experiencing abdominal pain.  R. at 294.  While hospitalized, she experienced a tonic-clonic seizure on August 11, 2011, and was treated with Dilantin.  R. at 306.  Plaintiff complained of visual changes that improved during the course of hospitalization, although at discharge she complained of intermittent blurred vision.  R. at 306.  Plaintiff denied attempting suicide, but she admitted that she felt depressed, could not sleep, and feared having panic attacks.  R. at 294.  She was diagnosed with major depression and panic disorder with paranoia.  R. at 294.  On August 16, 2011, Plaintiff received inpatient psychiatric treatment (R. at 307) and was treated with anti-anxiety and anti-depressant medication (R. at 325).

On September 26, 2011, Plaintiff reported during a neurological consultative examination with Baljeet Sethi, M.D., that she continued to have recurrent headaches associated with nausea, dizziness, and light-headedness; pain in her lower back; difficulty with walking; weakness and numbness in the lower extremity; imbalance; and poor sleep and memory.  R. at 325.  On examination, Plaintiff exhibited mild weakness in all four extremities, mild wasting of the small muscles of the hand; an unsteady gait with an inability to tandem walk; and mildly diminished touch on the right side of her body.  R. at 326-27.  On examination, Plaintiff could remember two

3

out of three items after five minutes, but calculation was done with some difficulty, and she was unable to do serial sevens. R. at 326. A review of Plaintiff's MRI scans in August 2011 revealed hypertensive encephalopathy and possible ischemia contributing to visual loss. R. at 327. An EMG in October 2011 revealed mild bilateral carpal tunnel syndrome with no evidence of cervical radiculopathy (R. at 341) and mild motor-sensory peripheral neuropathy of the bilateral upper extremities with no evidence of lumbar radiculopathy (R. at 343). An EEG was normal. R. at 332.

Plaintiff reported during a follow-up examination on November 17, 2011, that she continued to have breakthrough seizures, "mainly partial complex seizure and possible occasional partial motor seizure." R. at 346. She also complained of headaches, disorientation, and involuntary movement of her extremities. R. at 346. Plaintiff was able to ambulate well, however. R. at 346. Plaintiff's continued treatment with anti-seizure medications was recommended. R. at 346.

During an initial psychological evaluation at Lantern Therapeutic Services, Inc., on February 7, 2012, Plaintiff was diagnosed with major depressive disorder and anxiety disorder. R. at 381. She demonstrated intact recent and remote memory and paranoid ideation that people were talking about her. R. at 380. Plaintiff's GAF was rated at 44.[2] R. at 381.

---

[2] The GAF, or global assessment of functioning, scale rates psychological, social, and occupational functioning; it is divided into ten ranges of functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. text rev. 2000) [hereinafter *DSM-IV-TR*]. A GAF rating between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34; *see Martise v. Astrue*, 641 F.3d 909, 917 n.5 (8th Cir. 2011); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 598 n.1 (9th Cir. 1999). The current edition of the manual eliminated the GAF scale for reasons including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013).

On February 8, 2012, Christeen Allen, Psy.D., a licensed psychologist, conducted a consultative psychological examination of Plaintiff. R. at 350-55. Dr. Allen summarized her findings:

> [Plaintiff] was a 45 year old Caucasian female who reported diagnoses of status post stroke with visual impairment and depression. As a result, she is unable to perform many activities of daily living without assistance because her visual acuity is poor. She has a history of depression since 2009, but this mood disorder has apparently been exacerbated in response to her functional decline. Significant symptoms of anxiety are also reported. She reported no memory problems but she reported symptoms that were consistent with poor concentration which probably affected her ability to follow complex directions and function in other ways.
>
> [Plaintiff] is being treated for depression with psychotropic medication but she continues to report significant symptoms consistent with depression and anxiety. She is less socially involved at this time in her life.
>
> She is capable of handling her finances independently, including any benefits that she might receive.

R. at 352. Dr. Allen's diagnoses included major depressive disorder, anxiety disorder not otherwise specified, and a GAF rating of 55.[3] R. at 352.

On February 22, 2012, Nalin Mathur, M.D., conducted a consultative examination of Plaintiff. R. at 356-58. Plaintiff reported that, since August 2011, she had been unable to see properly but could now detect colors. R. at 356. She was depressed because of her inability to see. R. at 356. Plaintiff's range of motion in her cervical, thoracic, and lumbar spine was good. R. at 357. She was able to extend her hands fully bilaterally but had difficulty opposing her fingers. R. at 357. She had full strength in the upper and lower extremities. R. at 357. Plaintiff's visual acuity, however, was "very, very bad," as her vision "was around 20/200

---

[3] A GAF rating between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV-TR*, *supra* note 2, at 34.

bilaterally." R. at 357. Dr. Mathur's assessment of Plaintiff included status post encephalopathy secondary to malignant hypertension, depression, hypercholesterolemia, and "an episode of seizures which she never had again and is stable right now." R. at 357. Dr. Mathur stated the following functional assessment:

> I do not see any problem and she does not complain anything [sic] about sitting, standing, walking, carrying objects, handling objects, hearing or speaking but cannot drink [sic] because of the vision. Her gait, station and ability to bear weight is [sic] within normal limits. No need for an ambulatory aid.

R. at 357.

On February 28, 2012, a state agency consultant, L. Payne, Ph.D., using the psychiatric review technique ("PRT") under 20 C.F.R. §§ 404.1520a and 416.920a, evaluated Plaintiff's mental impairments under Listings 12.04, 12.06, and 12.09 relating to affective disorders, anxiety-related disorders, and substance addiction disorders (R. at 54-55, 65-66). *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04, 12.06, 12.09. Dr. Payne opined that, under paragraph B of the applicable listings, Plaintiff's mental impairments caused her to experience (1) mild restriction in activities of daily living; (2) mild difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) no repeated episodes of decompensation of extended duration. R. at 54, 65. Dr. Payne did not find evidence to establish the presence of the criteria under paragraph C of the applicable listings. R. at 54, 65. Dr. Payne thus assessed Plaintiff's mental residual functional capacity ("RFC") and opined that she was moderately limited in her ability to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and to (4) complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff otherwise was not significantly limited. R. at 57-58, 68-70.

On March 30, 2012, Pedro Rivera, M.D., a consultative ophthalmologist, examined Plaintiff (R. at 359-62) and noted on April 3, 2012, that "in August 2011 she had a stroke which affected her vision. Although her vision has been steadily improving since that event, she still feels that it is not back to normal. She is having trouble with distance vision predominantly." R. at 359. Dr. Rivera opined that Plaintiff

> has moderate visual loss due to occipital ischemia bilaterally. Fortunately her visual function has been slowly improving and additional recovery is possible. She needs proper glasses correction for distance vision, due to her myopia. At this time she would be unable to perform any jobs requiring fine visual acuity, reading of tiny print or handling tiny objects. She should not be driving at this time but could use public transportation without assistance.

R. at 360.

On April 16, 2012, another state agency consultant, W. Hakkarinen, M.D., assessed Plaintiff's physical RFC. R. at 55-57. Dr. Hakkarinen opined that Plaintiff occasionally could balance but could stoop, kneel, crouch, crawl, and climb ramps and stairs without limitation. R. at 56. Plaintiff could never climb ladders, ropes, or scaffolds, however. R. at 56. Although Plaintiff had no exertional, manipulative, visual, or communicative limitations, she was to avoid even moderate exposure to hazards such as machinery and heights. R. at 56-57.

Plaintiff saw David Federle, M.D., a primary care physician, between August 30, 2011, and November 7, 2012. R. at 413-19. On May 9, 2012, Dr. Federle opined that, in an eight-hour workday, Plaintiff could sit for eight hours, stand for five hours, walk for three hours, bend for three hours, and squat for two hours. R. at 426. Plaintiff could lift at most 25 pounds. R. at 426. Plaintiff's ability to climb, reach, or crawl was unknown. R. at 426. Dr. Federle opined that Plaintiff's visual impairment limited or interfered with her ability to function independently,

appropriately, and effectively on a continuous basis.  R. at 427.  Plaintiff's daily living activities and concentration were moderately limited, but she had no limitation in maintaining social functioning.  R. at 427.  Dr. Federle noted that Plaintiff "states she has problems seeing secondary to a stroke," which limited her ability to work from May 9, 2012, to May 9, 2013.  R. at 427.

On June 12, 2012, another state agency consultant, M. Ahn, M.D., assessed Plaintiff's physical RFC.  R. at 81-83, 94-96.  Dr. Ahn opined that Plaintiff occasionally could balance but could stoop, kneel, crouch, crawl, and climb ramps and stairs without limitation.  R. at 81-82, 94-95.  Plaintiff could never climb ladders, ropes, or scaffolds, however.  R. at 81, 94.  Although Plaintiff had no exertional, manipulative, visual, or communicative limitations, she was to avoid all exposure to hazards such as machinery and heights.  R. at 81-82, 94-95.

On July 6, 2012, Michael Greenberg, M.D., a neurologist, evaluated Plaintiff's continued vision problems.  R. at 404-05.  Plaintiff reported that "when she tries to read the letters 'run together.'"  She has a difficult time focusing.  She has episodes of 'blinking colors' and increasing difficulty with focus."  R. at 404.  Dr. Greenberg noted that Plaintiff's recent and remote memory was intact, as she recalled three out of three items after five minutes.  R. at 405.  Her attention span and concentration were good.  R. at 405.  Plaintiff's muscle strength was "5/5 for all groups tested."  R. at 405.  Dr. Greenberg noted that Plaintiff's sensory, gait, and coordination examinations were normal.  R. at 405.  On July 31, 2012, upon reviewing an updated MRI of Plaintiff's brain, Dr. Greenberg noted that the changes noted in her previous MRI were no longer present.  R. at 406.

On July 23, 2012, another state agency consultant, Jane Cormier, Ph.D., again used the PRT to evaluate Plaintiff's mental impairments under Listings 12.04, 12.06, and 12.09.  R. at 79-

80, 92-93.  Dr. Cormier opined that, under paragraph B of the applicable listings, Plaintiff's mental impairments caused her to experience (1) mild restriction in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) no repeated episodes of decompensation of extended duration.  R. at 79-80, 92-93.  Dr. Cormier did not find evidence to establish the presence of the criteria under paragraph C of the applicable listings.  R. at 80, 93.  Dr. Cormier thus assessed Plaintiff's mental RFC and opined that she was moderately limited in her ability to (1) maintain attention and concentration for extended periods; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to (3) interact appropriately with the general public.  Plaintiff otherwise was not significantly limited.  R. at 83-84, 96-97.

On January 2, 2013, Nicole Ross, O.D., a low-vision rehabilitation specialist at The Johns Hopkins Hospital, conducted a follow-up examination after Plaintiff's visit in November 2012 when Dr. Ross had noted that Plaintiff had short-term memory issues and delayed recall; difficulty with divided attention, organizing, and planning; and difficulty with spatial perception. R. at 420.  In January 2013, Dr. Ross noted that the clarity of Plaintiff's distance vision had improved after she obtained prescription eyeglasses.  She was able to see better while driving, although she only drove in little traffic.  R. at 420.  Plaintiff was able to read well with a hand-held magnifier.  R. at 420.  Dr. Ross noted, however, that Plaintiff continued to have difficulty with spatial orientation.  R. at 420.  Plaintiff was contemplating a return to work as a research analyst at a bank and was interested in exploring computer accessibility options.  R. at 420.  Dr.

Ross ultimately advised Plaintiff to limit driving with no distractions and to avoid driving in inclement weather. R. at 422.

A follow-up neurological examination by Dr. Greenberg's assistant on February 22, 2013, after an examination in January regarding Plaintiff's complaint of left leg numbness, revealed full muscle strength, decreased sensation in her lower legs and feet, and normal gait and coordination. R. at 408-09. She no longer complained of arm pain or headaches. R. at 408. Plaintiff was diagnosed with peripheral neuropathy, and her Neurontin was increased. R. at 409.

**B.** **Plaintiff's Testimony**

The ALJ reviewed Plaintiff's testimony:

> [Plaintiff] alleges that she has the following impairments: visual impairment, stroke disorder, depression and anxiety, and headaches. She testified that her visual limitations and worsening depression resulted from her seizure in August 2011 and that her vision stopped improving during Summer 2012. (*See also* [R. at 208-19]). She also testified that she goes to therapy once a week and that her depression results in her not being able to leave her home (agoraphobia), insomnia, and low self-esteem. According to [Plaintiff], she has anxiety attacks that last for up to five days (characterized by acute stomach upset, including vomiting and diarrhea) and experiences headaches on a daily basis. In addition, [Plaintiff] testified that she is easily confused, disoriented, and/or distracted, has problems with short-term memory, and cannot sleep through the night or [manage] her finances. (*See also* [R. at 208-19]).

> [Plaintiff] also alleges that her impairments significantly restrict her functional capacity and her activities of daily living. She testified that she lives with her father and step-mother and that her eyesight prevents her from reading books as well as the likes of recipes, food and medicine labels, and written instructions. According to [Plaintiff], family members administer her and her daughter's medications, she cannot help her daughter with her homework, and she does not leave her home for five or six days at a time, except to collect her daughter from the bus stop. In addition, [Plaintiff] testified that she has to sit extremely close to the television set in order to watch television programs.

R. at 15; *see* R. at 38-47.

## C.    VE Testimony

The VE testified that a hypothetical person with Plaintiff's same age, education, work experience, and the RFC outlined in Part III below could not perform Plaintiff's past work but could perform the light, unskilled[4] jobs of packer and packaging worker, bench worker, or machine tender.  R. at 27-31.  According to the VE, a person with a reduction of 20% in production rate could not perform any work.  R. at 32.  A person absent from work two days per month would not be employable.  R. at 33.  The VE's testimony that a person's inability to perform even simple, one- to four-step, routine, and repetitive tasks would preclude the performance of any work was consistent with the *Dictionary of Occupational Titles*.[5]  R. at 33-34.

## III

## Summary of ALJ's Decision

On May 31, 2013, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity since the alleged onset date of disability of August 7, 2011; and (2) had an impairment or a combination of impairments considered to be "severe" on the basis of the requirements in the Code of Federal Regulations; but (3) did not have an impairment or a combination of impairments meeting or equaling one of the impairments set forth in 20 C.F.R. pt. 404, subpt. P,

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. §§ 404.1567(b), 416.967(b).  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  *Id.* §§ 404.1568(a), 416.968(a).

[5] "The Social Security Administration has taken administrative notice of the *Dictionary of Occupational Titles*, which is published by the Department of Labor and gives detailed physical requirements for a variety of jobs."  *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.8 (9th Cir. 2007); *see DeLoatche v. Heckler*, 715 F.2d 148, 151 n.2 (4th Cir. 1983); 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1).  "Information contained in the [*Dictionary of Occupational Titles*] is not conclusive evidence of the existence of jobs in the national economy; however, it can be used to establish a rebuttable presumption."  *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993).

app. 1; and (4) was unable to perform her past relevant work; but (5) could perform other work in the national economy, such as a packer/packaging worker, bench worker, or machine tender. R. at 12-21.  The ALJ thus found that she was not disabled from August 7, 2011, through the date of the decision.  R. at 22.

In so finding, the ALJ found that Plaintiff experienced (1) mild restriction in activities of daily living; (2) moderate difficulties in social functioning; (3) moderate difficulties with regard to concentration, persistence, or pace; and (4) no episodes of decompensation of extended duration.  R. at 14.  The ALJ thus explained:

> Although [Plaintiff] has been diagnosed as having depression and anxiety and reports experiencing regular panic attacks ([R. at 350-55]), the record indicates that she is able to perform her activities of daily living (e.g. cleaning, laundry, cooking, and caring for her young daughter) without significant difficulty and can even drive a motor vehicle (*See* [R. at 208-28]; *see also* hearing testimony).  Also, the third-party Function Report indicates that although [Plaintiff] feels socially withdrawn, she leaves her home to participate in social events on a semi-regular basis and generally gets along with others, including her family members.  ([R. at 220-28]).  Further, examination findings show that [Plaintiff's] memory is intact and that her concentration problems do not seriously restrict her cognitive functioning.  ([R. at 325-46, 350-55]).

R. at 13-14.

> The ALJ ultimately found that Plaintiff had the RFC
>
> to perform a reduced range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).  [Plaintiff] can occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, and never climb ladders, ropes, and scaffolds.  She must avoid even moderate exposure to hazards.  She would require a job that does not require fine visual acuity, reading of tiny print, or handling tiny objects.  She should never operate a motor vehicle in a job setting.  She is limited to performing simple 1-4 step, routine, and repetitive tasks in a work environment where there would only be occasional contact with co-workers and supervisors and no contact with the general public.

R. at 14.

The ALJ gave "some" weight to the opinions of Drs. Payne and Federle, "great" weight to the opinions of Drs. Cormier and Rivera, and "partial" weight to the opinions of Drs. Hakkarinen and Ahn. R. at 20. The ALJ also considered Plaintiff's credibility and found that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." R. at 15. "[T]he evidence of record does not support a finding that [Plaintiff's] impairments prevent [her] from returning to work." R. at 15.

## IV

### <u>Disability Determinations and Burden of Proof</u>

The Social Security Act defines a disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-380 (2003). "If at any step a finding of disability or nondisability can be made,

the [Commissioner] will not review the claim further." *Thomas*, 540 U.S. at 24, 124 S. Ct. at 379; *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant has the burden of production and proof at steps one through four. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 n.5 (1987); *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013).

First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see whether the claimant has a "severe" impairment, i.e., an impairment or combination of impairments that significantly limits the claimant's physical or mental ability to do basic work activities. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995); *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).[6]

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Radford*, 734 F.3d at 293.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to

---

[6] The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Yuckert*, 482 U.S. at 141, 107 S. Ct. at 2291.

determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). RFC is a measurement of the most a claimant can do despite his or her limitations. *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at step four, age, education, and work experience. *See Hancock v. Astrue*, 667 F.3d 470, 472-73 (4th Cir. 2012). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *See Walls*, 296 F.3d at 290; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find that the claimant is not

disabled.  If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

V

**Substantial Evidence Standard**

The Court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards and whether the factual findings are supported by substantial evidence.  *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  In other words, the issue before the Court "is not whether [Plaintiff] is disabled, but whether the ALJ's finding that [Plaintiff] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law."  *Id.*  The Court's review is deferential, as "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Under this standard, substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.  *See Hancock*, 667 F.3d at 472; *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971).

In evaluating the evidence in an appeal of a denial of benefits, the court does "not conduct a *de novo* review of the evidence," *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986), or undertake to reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  *Hancock*, 667 F.3d at 472.  Rather, "[t]he duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court."  *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).  When conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ.  *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam).

## Discussion

Plaintiff contends that the ALJ erroneously assessed her RFC contrary to Social Security Ruling[7] ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996). Pl.'s Mem. Supp. Mot. Summ. J. 3-8, ECF No. 11-1. Plaintiff maintains that the ALJ failed to perform properly a function-by-function assessment of her ability to perform the physical and mental demands of work. *Id.* at 5. In particular, she contends that, although the ALJ found that her bilateral carpal tunnel syndrome was a severe impairment, the ALJ failed to include any limitation related to this impairment in his RFC assessment. *Id.* at 5-7. Plaintiff also asserts that the ALJ failed to include any limitation on her concentration, persistence, or pace in his RFC assessment, instead limiting her to performing simple, one- to four-step, routine, and repetitive tasks. *Id.* at 7. Thus, according to Plaintiff, substantial evidence does not support the ALJ's RFC assessment. *Id.* at 7-8. For the reasons discussed below, Plaintiff's assertions are unavailing.

SSR 96-8p explains how adjudicators should assess RFC and instructs that the RFC

"assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions" listed in the regulations. "Only after that may [residual functional capacity] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." The Ruling further explains that the residual functional capacity "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."

---

[7] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding on all components of the Social Security Administration. *Heckler v. Edwards*, 465 U.S. 870, 873 n.3, 104 S. Ct. 1532, 1534 n.3 (1984); 20 C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." *Pass*, 65 F.3d at 1204 n.3.

*Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (alteration in original) (footnote omitted) (citations omitted). The Fourth Circuit has held, however, that a per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis "is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" *Id.* (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)). Rather, remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (quoting *Cichocki*, 729 F.3d at 177). The court in *Mascio* concluded that remand was appropriate because it was "left to guess about how the ALJ arrived at his conclusions on [the claimant's] ability to perform relevant functions" because the ALJ had "said nothing about [the claimant's] ability to perform them for a full workday," despite conflicting evidence as to the claimant's RFC that the ALJ did not address. *Id.* at 637.

Plaintiff first contends that the ALJ failed to include in the RFC assessment any limitation related to her bilateral carpal tunnel syndrome, which the ALJ found to be a severe impairment (R. at 12-13). Pl.'s Mem. Supp. Mot. Summ. J. 5-7, ECF No. 11-1. "To the extent [Plaintiff] suggests that a finding of severe impairment at Step 2 necessarily requires limitations on a claimant's ability to perform basic work activities, this argument has no merit," however. *Burkstrand v. Astrue*, 346 F. App'x 177, 180 (9th Cir. 2009) (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228-29 (9th Cir. 2009)). As noted in Part IV above, the Commissioner determines at step two of the five-step sequential evaluation process whether the claimant has a medically severe impairment or combination of impairments. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273,

1290 (9th Cir. 1996) (citing *Yuckert*, 482 U.S. at 153-54, 107 S. Ct. at 2297-98); *see Felton-Miller v. Astrue*, 459 F. App'x 226, 230 (4th Cir. 2011) (per curiam) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement."). Accordingly, "[t]he findings that the [Commissioner] must make at steps two and four . . . are quite different." *Taylor v. Astrue*, Civil Action No. BPG-11-0032, 2012 WL 294532, at *8 (D. Md. Jan. 31, 2012). "At step four, on the other hand, the [Commissioner] must look to all the evidence on record and determine more precisely how, if at all, the claimant's impairments limit her ability to work." *Id.* "It is possible, therefore, for [the Commissioner] to find at step two that a claimant's condition is severe—because the medical evidence does not conclusively prove otherwise—and yet at step four find no substantial evidence that the condition actually limits the claimant's ability to work." *Id.*; *see Walker v. Colvin*, No. C13-3021-MWB, 2014 WL 1348016, at *7 (N.D. Iowa Apr. 3, 2014) ("A finding of a severe impairment at Step Two does not require the ALJ to provide related functional limitations at Step Four."), *report and recommendation adopted*, No. C13-3021-MWB, 2014 WL 2884028 (N.D. Iowa June 25, 2014); *Copes v. Comm'r, Soc. Sec. Admin.*, Civil No. SAG-11-3487, 2013 WL 1809231, at *1 (D. Md. Apr. 26, 2013) ("[A]n ALJ is not required to include a corresponding limitation for each severe impairment."). In any event, as Defendant points out, Plaintiff has not identified any additional limitation resulting from her bilateral carpal tunnel syndrome that the ALJ should have included in the RFC assessment. Def.'s Mem. Supp. Mot. Summ. J. 18, ECF No. 13-1. Because Plaintiff "has failed to point to *any* specific piece of evidence not considered by the Commissioner that might have changed the outcome of [her] disability claim," her argument in this regard thus is unavailing. *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014).

Plaintiff next contends that, although the ALJ determined that she had moderate difficulties with regard to concentration, persistence, or pace, the ALJ failed to include any limitation on her concentration, persistence, or pace in his RFC assessment, instead limiting her to performing simple, one- to four-step, routine, and repetitive tasks. Pl.'s Mem. Supp. Mot. Summ. J. 7, ECF No. 11-1 (citing R. at 14). The Fourth Circuit has held that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Mascio*, 780 F.3d at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). "[T]he ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Id.* The court in *Mascio* remanded the case for the ALJ to explain why the claimant's moderate limitation in concentration, persistence, or pace at step three did not translate into a limitation in the claimant's RFC. *Id.* Thus, Plaintiff maintains that substantial evidence does not support the ALJ's RFC assessment.

"The Social Security Administration has promulgated regulations containing 'listings of physical and mental impairments which, if met, are conclusive on the issue of disability.' A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford*, 734 F.3d at 291 (citation omitted); *see* 20 C.F.R. pt. 404, subpt. P, app. 1. In addition to the five-step analysis discussed above in Part IV and outlined in 20 C.F.R. §§ 404.1520 and 416.920, the Commissioner has promulgated additional regulations governing evaluations of the severity of mental impairments. 20 C.F.R. §§ 404.1520a, 416.920a. These regulations require application of a psychiatric review technique at the second and third steps of the five-step framework, *Schmidt v. Astrue*, 496 F.3d 833, 844

n.4 (7th Cir. 2007), and at each level of administrative review. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). This technique requires the reviewing authority to determine first whether the claimant has a "medically determinable mental impairment." *Id.* §§ 404.1520a(b)(1), 416.920a(b)(1). If the claimant is found to have such an impairment, then the reviewing authority must "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c)," *id.* §§ 404.1520a(b)(2), 416.920a(b)(2), which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). According to the regulations, if the degree of limitation in each of the first three areas is rated "mild" or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not "severe" and will deny benefits. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). If the claimant's mental impairment is severe, then the reviewing authority will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). If so, then the claimant will be found to be disabled. If not, the reviewing authority will then assess the claimant's RFC. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3).

"The ALJ's decision must show the significant history and medical findings considered and must include a specific finding as to the degree of limitation in each of the four functional areas." *Felton-Miller*, 459 F. App'x at 231 (citing 20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4)). With regard to the four functional areas, which correspond to the paragraph B criteria of the listings for mental disorders, "[*a*]*ctivities of daily living* include adaptive activities

such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [the claimant's] grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(1). "In the context of [the claimant's] overall situation, [the Commissioner assesses] the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. [The Commissioner] will determine the extent to which [the claimant is] capable of initiating and participating in activities independent of supervision or direction." *Id.* Moreover, "[*s*]*ocial functioning* refers to [the claimant's] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." *Id.* § 12.00(C)(2). Further, "[*c*]*oncentration, persistence, or pace* refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." *Id.* § 12.00(C)(3). "On mental status examinations, concentration is assessed by tasks such as having [the claimant] subtract serial sevens or serial threes from 100. In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits." *Id.* Finally, "[*e*]*pisodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." *Id.* § 12.00(C)(4). "Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." *Id.* Episodes of decompensation may be inferred from "medical

records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." *Id.* "The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id.*

Here, in finding that Plaintiff's mental impairments did not meet or medically equal the criteria of Listings 12.04 and 12.06 found in 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04 and 12.06, the ALJ found that "examination findings show that [Plaintiff's] memory is intact and that her concentration problems do not seriously restrict her cognitive functioning." R. at 14 (citing R. at 325-46, 350-55). The ALJ's hypothetical questions to the VE included a capacity to perform "simple, 1-4 step, routine, repetitive tasks in a work environment where there would only be occasional contact with coworkers and supervisors and no contact with the general public." R. at 30. The ALJ's assessment of Plaintiff's RFC also included a finding that she was "limited to performing simple 1-4 step, routine, and repetitive tasks in a work environment where there would only be occasional contact with co-workers and supervisors and no contact with the general public." R. at 14.

"An ALJ may account for a claimant's limitation with concentration, persistence, or pace by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court." *Kasey v. Colvin*, No. 7:14-CV-143, 2015 WL 5561837, at *9 (W.D. Va. Aug. 14, 2015), *report and recommendation adopted*, No. 7:14CV00143, 2015 WL 5561886 (W.D. Va. Sept. 21, 2015).

Substantial evidence in this case supports the ALJ's finding that Plaintiff is capable of performing simple, one- to four-step, routine, and repetitive tasks despite her moderate limitation in concentration, persistence, or pace. The ALJ noted Dr. Allen's observations that Plaintiff reported no long-term memory problems and followed short instructions without difficulty. R. at 18, 352. The ALJ also noted Dr. Allen's opinion that Plaintiff's memory was intact and that her deficits in concentration were mild. R. at 18, 352. The ALJ further noted that in July 2012 Plaintiff demonstrated intact abstract thought and memory and good attention span and concentration. R. at 18, 405. The ALJ also found that, according to Plaintiff's father, she could pay attention within normal limits, follow spoken instructions well, and handle changes in routine. R. at 18, 226-27. The ALJ thus found that Plaintiff "has the ability to at least remember simple instructions and execute simple tasks without significant difficulty." R. at 18.

"Thus, this is not a situation where the ALJ summarily concluded that a limitation of work involving" simple, one- to four-step tasks "accounts for [Plaintiff's] moderate impairment in concentration, persistence, and pace with no further analysis or consideration." *Kasey*, 2015 WL 5561837, at *10. "Rather, the medical evidence overwhelmingly supports the conclusion that[,] despite her moderate limitation in concentration, persistence, or pace, [Plaintiff] is capable of performing the basic mental demands of" simple, one- to four-step work. *Id.* "Considering the record as a whole, the ALJ determined that[,] while such limitations existed, they did not preclude [Plaintiff] from performing" simple, one- to four-step tasks. *Id.* "Consequently, [Plaintiff's] assertion that the ALJ erred by failing to properly account for her limitations in concentration, persistence, and pace is without merit." *Id.* Because "the ALJ discussed in detail the reasons supporting the conclusion that [Plaintiff] could sustain the required concentration and persistence necessary to perform simple, routine, and repetitive work tasks," remand under

*Mascio* is not warranted in this case. *Dean v. Comm'r, Soc. Sec. Admin.*, Civil No. SAG-14-1127, 2015 WL 1431548, at *2 (D. Md. Mar. 26, 2015).

In sum, substantial evidence supports the decision of the ALJ, who applied the correct legal standards here. Thus, Defendant's Motion for Summary Judgment is **GRANTED**, Plaintiff's Motion for Summary Judgment is **DENIED**, and the Commissioner's final decision is **AFFIRMED**.

## VII

## Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 13) is **GRANTED**. Plaintiff's Motion for Summary Judgment (ECF No. 11) is **DENIED**. The Commissioner's final decision is **AFFIRMED**. A separate order shall issue.

Date: November 20, 2015                          _____/s/_____

                                                                 Thomas M. DiGirolamo
                                                                 United States Magistrate Judge